IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| BENJAMIN LITTLE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 2:11-CV-107-WKW [WO] |
| | ) | Three-Judge Court |
| LUTHER STRANGE, *in his official* | ) | |
| *capacity as Attorney General for the* | ) | |
| *State of Alabama*, | ) | |
| | ) | |
| Defendant. | ) | |

Before TJOFLAT, Circuit Judge, and FULLER and WATKINS, District Judges.

PER CURIAM:

## MEMORANDUM OPINION

### I.  INTRODUCTION

Alabama Act No. 95-648, codified as §§ 12-24-1 and 12-24-2 of the Alabama Code ("the Alabama Act"), requires the filing of disclosure statements concerning judicial campaign contributions and the recusal of state justices or judges who receive substantial campaign contributions from a litigant or other described individual.  The Alabama Act became effective on January 1, 1996, but it has not been enforced, not even once, during its more than fifteen years of existence.

Notwithstanding the Alabama Act's undisputed dormancy, Plaintiff Benjamin Little ("Plaintiff") brings this action pursuant to § 5 of the Voting Rights Act

("VRA"), 42 U.S.C. § 1973c, against Luther Strange, the Attorney General for the state of Alabama, in his official capacity ("Defendant"), claiming that the Alabama Act requires preclearance.  Defendant has primary responsibility in Alabama for submitting to the United States Attorney General or to a three-judge federal district court in Washington, D.C., all new laws that require § 5 preclearance.  Plaintiff contends that Defendant has abdicated that responsibility because the Alabama Act brought about a change in a voting standard, practice or procedure subject to preclearance under § 5.  He seeks a declaratory judgment that § 5 of the VRA requires preclearance of the Alabama Act and a permanent injunction to prevent Defendant from enforcing the Alabama Act without preclearance.  A three-judge district court has been convened, pursuant to 28 U.S.C. § 2284 and 42 U.S.C. § 1973c, to determine the issues.

Before the court is Defendant's renewed motion to dismiss, filed pursuant to Rule 12 of the Federal Rules of Civil Procedure.  (Doc. # 39.)  Defendant moves for dismissal of the complaint on standing and ripeness grounds or, alternatively, for failure to state a claim for which relief can be granted.  Plaintiff filed an opposition (Doc. # 44), to which Defendant replied (Doc. # 46).  We conclude that the jurisdictional issues of standing and ripeness are dispositive and preclude a ruling on

the merits.  For the reasons to follow, the motion is due to be granted for lack of subject matter jurisdiction.

## II.  JURISDICTION

Because the Complaint alleges claims under § 5 of the VRA, subject matter jurisdiction is properly invoked pursuant to 28 U.S.C. §§ 1331, 1343(4), 2201 and 2202 and 42 U.S.C. § 1971(d).  This action was transferred to this court from the District Court for the District of Columbia in which it had originally been filed, in accordance with 28 U.S.C. § 1406(a).  Personal jurisdiction is not contested.

## III.  STANDARD OF REVIEW

Defendant invokes Rule 12 of the Federal Rules of Civil Procedure as the basis for his renewed motion to dismiss, but does not delineate under which subsection he is proceeding.  Because ripeness and standing pertain to a federal court's subject matter jurisdiction, they will be analyzed under Rule 12(b)(1).  *Fla. Ass'n of Rehab. Facilities, Inc. v. Fla. Dep't of Health & Rehab. Servs.*, 225 F.3d 1208, 1227 n.14 (11th Cir. 2000).

A Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction asserts either a facial or factual challenge to the complaint.  *McElmurray v. Consol. Gov't of Augusta-Richmond Cnty.*, 501 F.3d 1244, 1251 (11th Cir. 2007) (citing *Williamson*

*v. Tucker*, 645 F.2d 404, 412 (5th Cir. 1981)[1]); *accord Lawrence v. Dunbar*, 919 F.2d 1525, 1528-29 (11th Cir. 1990).  A factual attack challenges "the existence of subject matter jurisdiction in fact, irrespective of the pleadings, and matters outside the pleadings, such as testimony and affidavits, are considered."  *Lawrence*, 919 F.2d at 1529 (citation and internal quotation marks omitted).  A facial attack, on the other hand, challenges the complaint on its face and "require[s] the court merely to look and see if [the] plaintiff has sufficiently alleged a basis of subject matter jurisdiction."  *McElmurray*, 501 F.3d at 1251 (quoting *Lawrence*, 919 F.2d at 1529).  Under these review mechanisms, a "'court has the power to dismiss for lack of subject matter jurisdiction on any of three separate bases:  (1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts.'"  *Id.* (quoting *Williamson*, 645 F.2d at 413).

In this case, Defendant submits evidence in support of his renewed motion to dismiss; thus, the motion presents a factual attack on subject matter jurisdiction.  Plaintiff also responds to the motion with his own exhibits.  Both Defendant's and

---

[1] In *Bonner v. City of Prichard*, the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit issued prior to October 1, 1981.  *See* 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).  *Williamson* was decided on May 20, 1981, and, thus, is binding precedent.

Plaintiff's exhibits consist primarily of correspondence between former Alabama Attorneys General and the United States Department of Justice exposing their diametrical positions as to whether Alabama Act No. 95-648 requires § 5 preclearance. The content of that correspondence is not in dispute, is embraced by Plaintiff's allegations, and for the most part is set out verbatim in the Complaint. Because no material facts relevant to the standing and ripeness inquiry are in dispute, the jurisdictional question may be decided without resolving any factual disputes, and discovery and a hearing are unnecessary. We consider, therefore, the Complaint supplemented by the undisputed facts, and, unless controverted by the undisputed facts, the allegations in the Complaint are presumed true.

## IV.  BACKGROUND

A.  __The Enactment of Act No. 95-648__

The events leading up to this litigation date back to 1995, when the Alabama Legislature passed Alabama Act, No. 95-648, codified as §§ 12-24-1 and 12-24-2. Section 12-24-1 provides:

> The Legislature intends by this chapter to require the recusal of a justice or judge from hearing a case in which there may be an appearance of impropriety because as a candidate the justice or judge received a substantial contribution from a party to the case, including attorneys for the party, and all others described in subsection (b) of Section 12-24-2. This legislation in no way intends to suggest that any sitting justice or judge of this state would be less than fair and impartial in any case. It

5

merely intends for all the parties to a case and the public be made aware of campaign contributions made to a justice or judge by parties in a case and others described in subsection (b) of Section 12-24-2.

Ala. Code § 12-24-1 (1995).  Section 12-24-2, titled, "Filing by judges, justices, parties, and attorneys of disclosure statements concerning campaign contributions," provides:

(a) Any justice or judge of an appellate or circuit court of this state shall file, at least two weeks prior to the commencement of his or her term of office, with the Secretary of State, a statement disclosing the names and addresses of campaign contributors and the amount of each contribution made to him or her in the election immediately preceding his or her new term in office. Contributions from political action committees may be accepted if the committee furnishes to the Secretary of State according to existing law a list of names and addresses of contributors and an amount properly attributable to each contributor.  When a justice or judge does not file this annual statement, the Secretary of State shall notify the Administrative Office of Courts and that office shall withhold further compensation to the justice or judge pending compliance with this section.

(b) The Supreme Court shall provide under the appropriate rules of court, a rule or rules which provide as follows:  In an appellate court proceeding the attorneys for all parties shall serve certificates of disclosure on all attorneys of record before such court within 28 days after the filing of the notice of appeal; or in a circuit court within 28 days after notice of the identity of the judge presiding on the case.  Each certificate shall state the amount, if any, of campaign contributions by the respective individual donor or entity to any justice or judge of an appellate court where the case is pending, or if it is a trial court proceeding, the amount, if any, of campaign contributions by the respective individual donor or entity to the judge presiding over the case, made in the last election by the party or real parties in interest, any holder of five percent (5%) or more of a corporate party's stock, any

employees of the party acting under that party's direction, any insurance carrier for the party which is potentially liable for the party's exposure in the case, the attorney for the party, other lawyers in practice with the attorney, and any employees acting under the direction of the attorney or acting under the direction of those in practice with the attorney. The failure to file the certificates of disclosure within the time frames set out above shall not affect the validity of the filing but the court may impose sanctions provided for by Rule 37(b) (2) (C, D) of the Alabama Rules of Civil Procedure, for the failure of a party to comply with this section after being ordered to do so.

(c) The action shall be assigned to a justice or judge regardless of the information contained in the certificates of disclosure. If the action is assigned to a justice or judge of an appellate court who has received more than four thousand dollars ($4,000) based on the information set forth in any one certificate of disclosure, or to a circuit judge who has received more than two thousand dollars ($2,000) based on the information set out in any one certificate of disclosure, then, within 14 days after all parties have filed a certificate of disclosure, any party who has filed a certificate of disclosure setting out an amount including all amounts contributed by any person or entity designated in subsection (b), below the limit applicable to the justice or judge, or an amount above the applicable limit but less than that of any opposing party, shall file a written notice requiring recusal of the justice or judge or else such party shall be deemed to have waived such right to a recusal. Under no circumstances shall a justice or judge solicit a waiver of recusal or participate in the action in any way when the justice or judge knows that the contributions of a party or its attorney exceed the applicable limit and there has been no waiver of recusal.

Ala. Code § 12-24-2 (1995). The Alabama Act became effective January 1, 1996.

## B.   Section 5 of the Voting Rights Act

Congress enacted the VRA to "rid the country of racial discrimination in voting." *South Carolina v. Katzenback*, 383 U.S. 301, 315 (1966). Section 5 of the

VRA precludes a covered state, such as Alabama, from "enact[ing] or seek[ing] to administer any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting," unless it complies with one of § 5's two approval procedures. 42 U.S.C. § 1973c; *see also Riley v. Kennedy*, 553 U.S. 406, 414 (2008) ("Alabama is a covered jurisdiction with a coverage date of November 1, 1964." (citing 30 Fed. Reg. 9897 (1965)). A covered state may obtain a declaratory judgment from the District Court for the District of Columbia that the change "neither has the purpose nor will have the effect of denying or abridging the right to vote on account of race or color," or it may submit the change to the U.S. Attorney General

for preclearance.[2]  42 U.S.C. § 1973c; *see also Morris v. Gressette*, 432 U.S. 491, 495 (1977).

---

[2] Section 5, as set forth in 42 U.S.C. § 1973c, provides in relevant part:

Whenever a State or political subdivision with respect to which the prohibitions set forth in section 1973b(a) of this title based upon determinations made under the first sentence of section 1973b(b) of this title are in effect shall enact or seek to administer any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting different from that in force or effect on November 1, 1964, . . ., such State or subdivision may institute an action in the United States District Court for the District of Columbia for a declaratory judgment that such qualification, prerequisite, standard, practice, or procedure neither has the purpose nor will have the effect of denying or abridging the right to vote on account of race or color, or in contravention of the guarantees set forth in section 1973b(f)(2) of this title, and unless and until the court enters such judgment no person shall be denied the right to vote for failure to comply with such qualification, prerequisite, standard, practice, or procedure: Provided, That such qualification, prerequisite, standard, practice, or procedure may be enforced without such proceeding if the qualification, prerequisite, standard, practice, or procedure has been submitted by the chief legal officer or other appropriate official of such State or subdivision to the Attorney General and the Attorney General has not interposed an objection within sixty days after such submission, or upon good cause shown, to facilitate an expedited approval within sixty days after such submission, the Attorney General has affirmatively indicated that such objection will not be made.  Neither an affirmative indication by the Attorney General that no objection will be made, nor the Attorney General's failure to object, nor a declaratory judgment entered under this section shall bar a subsequent action to enjoin enforcement of such qualification, prerequisite, standard, practice, or procedure.  In the event the Attorney General affirmatively indicates that no objection will be made within the sixty-day period following receipt of a submission, the Attorney General may reserve the right to reexamine the submission if additional information comes to his attention during the remainder of the sixty-day period which would otherwise require objection in accordance with this section. Any action under this section shall be heard and determined by a court of three judges in accordance with the provisions of section 2284 of Title 28 and any appeal shall lie to the Supreme Court.

42 U.S.C. § 1973c.

The role of a three-judge court in a § 5 suit is limited.  The three-judge court has authority only to "determine (i) whether a change was covered by § 5, (ii) if the change was covered, whether § 5's approval requirements were satisfied, and (iii) if the requirements were not satisfied, what remedy was appropriate." *City of Lockhart v. United States*, 460 U.S. 125, 129 n.3 (1983).  Hence, "[t]he goal of a three-judge district court facing a § 5 challenge must be to ensure that the covered jurisdiction submits its election plan to the appropriate federal authorities for preclearance as expeditiously as possible." *Lopez v. Monterey Cnty.*, 519 U.S. 9, 24 (1996).  "Once a covered jurisdiction has complied with these preclearance requirements, § 5 provides no further remedy." *Id.* at 23 (citing *Allen v. State Bd. of Elections*, 393 U.S. 544, 549-50 (1969)).   The three-judge court "lacks authority to consider the discriminatory purpose or nature of the changes." *Id.*  The "exclusive authority to pass on the discriminatory effect or purpose of an election change" lies with the U.S. Attorney General and the U.S. District Court for the District of Columbia.  *Id.*  Of course, a three-judge court always has to consider its own jurisdiction to address the controversy in the first place.

## C.     The Preclearance Activities Surrounding the Alabama Act

The material facts that follow are undisputed.  The then-Alabama Attorney General Jeff Sessions (now United States Senator) promptly submitted the Alabama

Act to the Department of Justice ("DOJ") for preclearance under § 5 of the VRA by letter dated March 7, 1996.  (Compl. ¶ 22; March 7, 1996 Letter (Pl. Ex. 2 to Doc. # 44).)  In a letter dated May 13, 1996, while the U.S. Attorney General had the Alabama Act under review, the DOJ, through then-Assistant U.S. Attorney General Deval L. Patrick (now Governor of Massachusetts), deemed the submission "insufficient" to determine whether the Alabama Act passed scrutiny under § 5.  (May 13, 1996 Letter 1 (Def. Ex. B to Doc. # 39).)  In an itemized list, the Assistant U.S. Attorney General requested six categories of information, to include the "rule or rules of the Alabama Supreme Court adopted pursuant to Section 2(b) of Act No. 95-648." (May 13, 1996 Letter 1-2.)  The Assistant U.S. Attorney General also asked for a response to the allegation that the

> recusal provisions triggered by the reporting requirement in Act No. 95-648 will result in lower individual campaign contributions to candidates for judicial election, requiring candidates to seek contributions from a wider range of supporters.  Because of societal discrimination black candidates face greater obstacles in securing contributions from the public at large.  The result, it is charged, will make it more difficult for black candidates to run successful campaigns, thereby reducing the voting effectiveness of minority voters who constitute the base of their support.

(May 13, 1996 Letter 2; Compl. ¶ 23.)  It was also noted that the U.S. Attorney General had sixty days to review completed § 5 submissions and that the sixty-day

review period would begin when the requested information was received.  (May 13, 1996 Letter 2.)

On May 20, 1996, instead of supplementing the initial submission, Alabama Attorney General Sessions withdrew the request for preclearance, concluding that the Alabama Act was not subject to the review provisions of § 5.  (May 20, 1996 Letter (Pl. Ex. 4 to Doc. # 44); Compl. ¶ 24.)  The DOJ responded to the withdrawal of the preclearance request by letter dated July 23, 1996:

> We respectfully disagree with your position that no portions of Act No. 95-648 are subject to the preclearance requirement of Section 5 of the Voting Rights Act.  Section 2(a) of Act No. 95-648 requires elected judges to file disclosure statements concerning campaign contributions, and subjects judges who do not comply with this requirement to denial of the salary of their office.  Section 2(b) of the act requires attorneys to file reports of campaign contributions ("certificates of disclosure") not previously required under Alabama law.  To avoid the risk that a particular judge will be barred from litigation involving them (*i.e.*, that the judge will be recused from their case because the amount of their contribution to the judge's campaign exceeds the amount established in Act No. 95-648), potential campaign contributors will have to limit the amount of their contributions to avoid the recusal mechanism established in Section 2 of the Act.  By the same token, this section will likely affect political campaigns of judicial candidates, particularly with regard to their fundraising practices.  These aspects of the law clearly constitute changes in practices of [sic] procedures affecting voting.

(July 23, 1996 Letter 2 (Pl. Ex. 5 to Doc. # 44); Compl. ¶ 25.)

Unpersuaded by the DOJ's position, the Alabama Attorney General pronounced by letter dated July 30, 1996:  "The State of Alabama will enforce Act

No. 95-648, and the Attorney General of Alabama will not submit this law for preclearance.  Section 5 does not apply."  (July 30, 1996 Letter 2 (Pl. Ex. 6 to Doc. # 44); Compl. ¶ 26.)  The position of the Alabama Attorney General was reinforced a year later by Attorney General Sessions's successor, William H. Pryor Jr. (now United States Circuit Judge for the Eleventh Circuit Court of Appeals).  In a letter dated July 23, 1997, and responding to the DOJ's inquiry concerning his failure to submit the Alabama Act for preclearance, then-Attorney General Pryor said, "We reiterate that the State of Alabama will enforce Act No. 95-648.  The Attorney General of Alabama will not submit this law for preclearance because Section 5 does not apply."  (July 23, 1997 Letter 2 (Pl. Ex. 8 to Doc. # 44); Compl. ¶ 29.)  There is no record of further correspondence after July 23, 1997, between the DOJ and the Alabama Attorney General regarding preclearance of the Alabama Act.  It is undisputed, however, that the Alabama Attorney General has not obtained a declaratory judgment from the U.S. District Court for the District of Columbia or preclearance from the U.S. Attorney General.  The U.S. Attorney General also has not sued for "preventive relief."  42 U.S.C. § 1973j(d).

In this lawsuit, the Alabama Attorney General continues to "den[y] that the Act requires preclearance."  (Answer ¶ 19.)  He takes a slightly different position, however, than his predecessors as to the Alabama Act's enforceability.  While not

expressly recanting his office's previously-held position that the state of Alabama "will enforce Act No. 95-648," he asserts that the Alabama Act "is not enforceable until such time as the Alabama Supreme Court adopts the required rules." (Answer ¶ 26.) It is not disputed that the Alabama Supreme Court has not adopted those rules. Ironically, the Alabama Supreme Court has refused to adopt the rules required by § 12-24-2(b), pending preclearance of the Alabama Act under Section 5. That refusal is evidenced, for example, in a letter dated in 1998, from the Clerk of the Alabama Supreme Court to the Alabama Judicial Inquiry Commission, announcing that the "official reason" the Alabama Supreme Court had "not adopted any rules to implement Section 12-24-2(b)" is because the Alabama Act "has not been precleared by the Justice Department." (Nov. 23, 1998 Letter (Pl. Ex. 9 to Doc. # 44); Compl. ¶ 31.) There is no allegation or argument that the passage of time or changes in the judicial makeup of the Alabama Supreme Court have altered its 1998 position.

Moreover, over the years, most recently in 2004, in published opinions, individual justices on the Alabama Supreme Court have commented on the uncertain status of the Alabama Act. *See Brackin v. Trimmier Law Firm*, 897 So. 2d 207, 233-34 (Ala. 2004) (Brown, J., denying a motion to recuse) (observing that "whether §§ 12-24-1 and -2 . . . , which have not yet obtained 'preclearance' . . . , are even enforceable has been well documented by this Court"); *Ex parte McLeod*, 725 So. 2d

14

271, 274 (Ala. 1998) (per curiam) (noting that preclearance of the Alabama Act by the DOJ "is still pending," and that "[i]f and when that Act is cleared" by the DOJ, "a contributing party will have the burden of disclosing any contributions made to the judge (trial or appellate) in that party's case"); *Finley v. Patterson*, 705 So. 2d 834, 835-36 & n.1 (Ala. 1997) (Cook, J., concurring specially) (observing that the "enforceability of the [A]ct is in legal limbo" and outlining the history of the communications between the Alabama Attorney General and the DOJ concerning preclearance of the Alabama Act).

The Alabama Administrative Office of Courts, which is charged with withholding compensation to a state justice or judge who fails to comply with the disclosure requirements, *see* Ala. Code § 12-24-2(a), naturally has joined forces with the Alabama Supreme Court.  In 1999, responding to a presiding state circuit judge's inquiry, the Administrative Office of Alabama Courts opined that until the Alabama Act "is precleared, it is not legally enforceable and our office will not take any action for noncompliance with the Alabama Act's provisions."  (Jan. 6, 1999 Letter (Pl. Ex. 11 to Doc. # 44); Compl. ¶ 32.)  Letters with the same or substantially the same language were provided by the Administrative Office of Alabama Courts to other state circuit judges in 1999 and 2000.  (Compl. ¶¶ 32-33.)  And, on April 30, 1999, the Alabama Judicial Inquiry Commission issued Advisory Opinion # 99-725, in

which it answered the following question: "'Must a Judge comply with the reporting requirement of Ala. Code § 12-24-2?'"   (Compl. ¶ 34.)   It answered, "The Commission is not authorized to determine the enforceability of a statute; this is a legal question the Judge himself may address." (Compl. ¶ 34.)   The end result is that the Alabama Act has not been implemented or enforced, not even once, during its fifteen years on the statutory books.

Hence, as mapped out by the state entities, the roads to enforcement end before they begin.   The Alabama Supreme Court takes the way of § 5 preclearance, but the Alabama Attorney General has blockaded that road by his refusal to submit the law for preclearance.   The Alabama Attorney General takes the way of the rules, but the Alabama Supreme Court has blockaded that road by its refusal to adopt rules without preclearance.   To loosely paraphrase Robert Frost, two roads diverged from the statute, and neither was taken.   Indeed, no step has yet trodden either.[3]

**D.**   **Procedural History**

On July 19, 2010, Plaintiff filed this § 5 action in the District Court for the District of Columbia, against the Alabama Attorney General (then Troy King, now Luther Strange) and U.S. Attorney General Eric Holder, in their official capacities.

---

[3] Robert Frost, The Road Not Taken (1920).

Upon Plaintiff's motion made pursuant to 28 U.S.C. § 2284, a three-judge court was convened in the District Court for the District of Columbia.  (Doc. # 14.)

On August 12, 2010, the Alabama Attorney General filed an Answer to the Complaint and also moved to transfer venue to the Middle District of Alabama on grounds that venue was not proper or convenient in the District of Columbia.  (Docs. # 11-13.)  He also moved to dismiss the Complaint on grounds that Plaintiff lacked standing, that Plaintiff's claims were not ripe, and that Plaintiff failed to state a claim for which relief can be granted.  Plaintiff opposed the motion on all grounds.  (Doc. # 15.) On September 17, 2010, U.S. Attorney General Eric Holder also filed a motion to dismiss, arguing in part that Plaintiff lacked standing to sue him.  (Doc. # 17; *see also* Doc. # 19.)  Plaintiff refuted that argument as well.  (Doc. # 18.)

On January 20, 2011, the District of Columbia three-judge court entered a Memorandum Opinion, granting U.S. Attorney General Holder's motion to dismiss for lack of standing and granting the Alabama Attorney General's motion to transfer venue to the Middle District of Alabama for the convenience of the parties.  (Doc. # 21.)  The transfer rendered it unnecessary for the three-judge court to decide the other issues raised in the Alabama Attorney General's motion, and, thus, that court left "all remaining motions . . . for decision by the transferee court."  (Doc. # 21.)  On

January 31, 2011, this case was transferred to the Middle District of Alabama.  (Doc.
# 22.)

A three-judge court was convened in this district on February 25, 2011.  (Doc.
# 33.)  On March 8, 2011, a status conference before the three-judge court was held.
(Doc. # 36.)   At the status conference, counsel for Plaintiff confirmed that the
Alabama Act "has not yet been enforced in any case," and counsel for both parties
agreed that there are no disputed issues of fact.  (Tr. of Status Conference 9, 23, 29-30
(Doc. # 43).)

## V.  DISCUSSION

Defendant moves to dismiss the Complaint for lack of standing to sue and lack
of ripeness for judicial review.   "Standing and ripeness present the threshold
jurisdictional question of whether a court may consider the merits of a dispute."
*Elend v. Basham*, 471 F.3d 1199, 1204 (11th Cir. 2006).  "Both standing and ripeness
originate from the Constitution's Article III requirement that the jurisdiction of
federal courts be limited to actual cases and controversies."  *Id.* at 1204-05.  In a pre-
enforcement suit for declaratory and injunctive relief, the analyses of the doctrines
of standing and ripeness tend to overlap.  *Id.* at 1205.  "This is because claims for
pre-enforcement review involve the possibility of wholly prospective future injury,
not a prayer for relief from damages already sustained."  *Id.*  It is the injury-in-fact

element of standing "that most often converges with ripeness." *Id.* "If an action for prospective relief is not ripe because the factual predicate for the injury has not fully materialized, then it generally will not contain a concrete injury requisite for standing." *Id.*; *see also Warth v. Seldin*, 422 U.S. 490, 499 n.10 (1975) (noting that "[t]he standing question . . . bears close affinity to [the] question[ ] of ripeness – whether the harm asserted has matured sufficiently to warrant judicial intervention . . .". This case, like *Elend*, presents an "instance of the doctrinal overlap between standing and ripeness analysis." 471 F.3d at 1205.

Notwithstanding the "conspicuous overlap" between the doctrines of standing and ripeness, *id.*, we discuss them separately. We take up the issue of standing first, then ripeness. In the end, we lack subject matter jurisdiction for failure of Plaintiff to demonstrate an injury that is concrete or actual, or an imminent threat of future injury. The absence of subject matter jurisdiction precludes us from reaching the merits of the § 5 issue.

## A.   <u>Standing</u>

The requirement of Article III standing is both a constitutional limitation on federal court jurisdiction and a prudential limitation on its exercise. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). We are concerned today only with the constitutional requirements.

The elements for evaluating constitutional standing are threefold.  First, the plaintiff must have suffered an "injury in fact."  *Id.* (internal quotation marks omitted).  An injury in fact is "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical."  *Id.* (internal citations and quotation marks omitted).  "Second, there must be a causal connection between the injury and the conduct complained of – the injury has to be 'fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court.'"  *Lujan*, 504 U.S. at 560 (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41-42 (1976)).  "Third, it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'"  *Id.* (quoting *Simon*, 426 U.S. at 38).  The burden is on the party invoking federal jurisdiction to prove each of the elements of standing.  *Bischoff v. Osceola Cnty., Fla.*, 222 F.3d 874, 878 (11th Cir. 2000).  Defendant says that Plaintiff's Complaint is deficient as to all three elements.

### 1.   *Injury*

Plaintiff contends that he has suffered "two distinct injuries" that satisfy Article III's injury-in-fact requirement.  (Pl.'s Resp. 7 (Doc. # 44).)  He argues that he has suffered, first, an injury to his rights under § 5 and, second, an injury to his First

Amendment rights.  On this record, both of the proposed injuries fall short of establishing an Article III injury in fact.

### a.   § 5 Injury

Plaintiff argues that § 5 itself creates the requisite injury to confer standing under Article III. Plaintiff focuses on the disjunctive phrase in § 5 requiring preclearance whenever a covered state "shall enact *or* seek to administer" any change in a voting practice.  (Pl.'s Resp. 7-8, 9 (citing § 1973c (emphasis added)).)  Plaintiff argues that under § 5, an African-American citizen who is registered to vote in Alabama, such as he, suffers a "concrete, particularized, and actual injury" (*i.e.*, an Article III injury in fact) any time an Alabama law that results in a change in a voting practice is *enacted*, but not precleared, regardless of whether the law is ever enforced. (Pl.'s Resp. 8-9.)  Plaintiff contends that *Allen v. State Board of Elections*, 393 U.S. 544 (1969), supports his position.  (Pl.'s Resp. 9.)  Defendant counters that the phrase "enact or seek to administer," as set out in § 5,  "speaks only to the State's obligations before enforcing a change" in voting procedures, and does not answer the question "whether a private plaintiff has suffered an injury even when a state law is *not* enforced." (Def.'s Reply 5 (Doc. # 46).)  Defendant argues that an unenforced statute "causes no harm to anyone," and fails to provide even a § 5 litigant with Article III standing.  (Def.'s Reply 5-6.)

In *Allen*, the Supreme Court held that § 5's mandate that "'no person shall be denied the right to vote for failure to comply with (a new state enactment covered by, but not approved under, § 5)'" implied a private right of action.  393 U.S. at 555 (quoting § 1973c).  That mandate "indicate[d] that [the plaintiffs] may seek a declaratory judgment that a new state enactment is governed by § 5" and "an injunction against further enforcement [of an unprecleared enactment], pending the State's submission of the legislation pursuant to § 5."  *Id.*  The Court observed that, absent a private right of action, "[t]he guarantee of § 5 that no person shall be denied the right to vote for failure to comply with an unapproved new enactment subject to § 5, might well prove an empty promise . . . ."  *Id.* at 557.  *Allen*, thus, answered in the affirmative the threshold issue "whether private litigants may invoke the jurisdiction of the district courts to obtain the relief requested [under § 5]."  *Id.* at 555.

It is true, as Plaintiff emphasizes (Pl.'s Resp. 9), that, in its analysis of a private litigant's right to bring suit under § 5, the *Allen* Court observed that it was "consistent with the broad purpose of the [VRA]," to grant not only the U.S. Attorney General, but also "the individual citizen[,] *standing* to insure that his city or county government complies with the § 5 approval requirements."  393 U.S. at 557 (emphasis added).  However, nothing in that language or in *Allen* as a whole establishes or suggests that a private litigant may bring a § 5 suit without a

concomitant showing of an Article III injury in fact.   To adopt Plaintiff's interpretation of *Allen* not only would expand § 5 beyond even its "broadest possible scope," *id.* at 567, but would contravene settled precedent that "Congress cannot erase Article III's standing requirements by statutorily granting the right to sue to a plaintiff who would not otherwise have standing," *Raines v. Byrd*, 521 U.S. 811, 820 n.3 (1997).  Section 5 cannot vest a plaintiff with a "statutory injury" (Pl.'s Resp. 10) that supplants the requirement of an Article III injury in fact, one that is "actual or imminent, not conjectural or hypothetical."[4]  *Lujan*, 504 U.S. at 560.

The two unpublished district court decisions upon which Plaintiff relies also are unpersuasive.  *See Jenkins v. Ray*, No. 4:06-CV-43 (CDL), 2006 WL 1582426 (M.D. Ga. June 5, 2006); *Janis v. Nelson*, No. 09-5019-KES, 2009 WL 4505935 (D.S.D. Nov. 24, 2009).   In *Jenkins*, the plaintiffs alleged that they suffered a constitutional standing injury when, as a result of redistricting, they would be unable to vote for the reelection of an incumbent black member of the county board of education who, after his initial election, was "drawn out" of the plaintiffs'

---

[4] When enacting a statute, Congress can expressly excuse prudential standing limitations, but it cannot expand Article III's case-or-controversy limitations.  *See Bennett v. Spear*, 520 U.S. 154, 162 (1997) ("[U]nlike their constitutional counterparts, [prudential standing requirements] can be modified or abrogated by Congress."); *see also Gollust v. Mendell*, 501 U.S. 115, 126 (1991) ("Although 'Congress may grant an express right of action to persons who otherwise would be barred by prudential standing rules, . . . Art. III's requirement remains:  the plaintiff still must allege a distinct and palpable injury to himself.'" (quoting *Warth*, 422 U.S. at 501)).

predominantly black district, and reassigned to a predominantly white district. 2006 WL 1582426, at *1-2. The district court found that the plaintiffs had Article III standing to bring a § 5 suit to enjoin local election officials from preventing the board member from running for reelection in the plaintiffs' district in the upcoming election, absent preclearance of the district reassignment. *Id.* at *2.

In *Jenkins*, the plaintiffs suffered concrete and imminent injuries, as required to establish Article III standing. Namely, it was certain that the plaintiffs would not be able to vote in the next election for the candidate of their choice because, aided by an interpretation by local election officials, the new redistricting lines had removed that candidate from the plaintiffs' voting district. We decline to read *Jenkins* to extend Article III "standing based on a statutory § 5 injury" in every § 5 case (Pl.'s Resp. 7), especially in a case in which a long-standing statute has not been enforced. *Cf. Poe v. Ullman*, 367 U.S. 497, 507 (1961) ("[T]he mere existence of a state penal statute would constitute insufficient grounds to support a federal court's adjudication of its constitutionality in proceedings brought against the State's prosecuting officials if real threat of enforcement is wanting.").

In *Janis*, after the plaintiffs' names were removed from the voter registration rolls because of their status as convicted felons, thereby denying the plaintiffs the right to vote in the 2008 federal, state and local elections, the plaintiffs brought

claims under §§ 2 and 5 of the VRA. *See* 2009 WL 4505935, at *1. Rejecting a defense motion to dismiss, the district court found that "[a]ssuming the factual allegations in the amended complaint are true, plaintiffs suffered an injury in fact *because the practice or procedure of removing plaintiffs' names from the registered voting list* is a change in voting procedure that has not been precleared pursuant to Section 5." *Id.* at *2. The court continued, "[T]here is 'an invasion of a legally protected interest' because plaintiffs are being deprived of Section 5's safeguards by the existence of an unprecleared voting practice . . . ." *Id.* Although Plaintiff grasps hold of *Janis*'s statement that the plaintiffs suffered an injury in fact because the unprecleared voting change denied them "Section 5's safeguards," that statement cannot be read in a vacuum. 2009 WL 4505935, at *2; (*see* Pl.'s Resp. 8 (arguing that Plaintiff suffered an injury in fact because Defendant's "failure to submit the Alabama Act for preclearance denies [Plaintiff] the safeguards of § 5 on a continuing basis").) Rather, the statement must be read in view of the actual harm suffered by the plaintiffs: an unprecleared voting practice that resulted in the removal of the plaintiffs' names from the registered voting list and the plaintiffs' inability to cast a ballot in the prior 2008 election.

In other words, *Jenkins* and *Janis* did not (and could not) find that § 5 created a right of action in a person who had not been injured in fact, but rather these

decisions premised Article III standing on a concrete and an actual harm suffered by the plaintiffs. Plaintiff's proposed statutory formula for satisfying Article III's injury-in-fact requirement is fundamentally unsound, and we reject it.

### b.   Constitutional Injury

At no time has an Alabama state justice or judge, while presiding over a case in which Plaintiff was a party, had to recuse himself or herself on the basis that Plaintiff gave the judicial officer a campaign contribution greater than the specified limits. Indeed, there has been no such campaign contribution made by Plaintiff, and no lawsuit has been assigned to a recipient of such contribution. Notwithstanding these facts, Plaintiff argues that he has a cognizable injury in fact for Article III standing purposes based upon the "chilling effect" the Alabama Act has on "his First Amendment right to free speech from the threatened enforcement, at any time, of the unprecleared act." (Pl.'s Resp. 8.) Plaintiff says that although not presently a party to a lawsuit, he has been one in the past and is certain to be one again in the future, given his seat on the city council. Plaintiff contends that he wants to contribute to state judicial candidates' campaigns, but has refrained from doing so, for fear that the

Alabama Act will be enforced against him in a future lawsuit and that he will be deprived of his judicial preference in litigation.[5]  (Pl.'s Resp. 8-9.)

In the First Amendment context, "'an actual injury [for Article III standing] can exist when the plaintiff is chilled from exercising her right to free expression or forgoes expression in order to avoid enforcement consequences.'"  *Bloedorn v. Grube*, 631 F.3d 1218, 1228 (11th Cir. 2011) (quoting *Pittman v. Cole*, 267 F.3d 1269, 1283 (11th Cir. 2001)).  This "chilling effect" constitutes an adequate injury in fact for standing because the "alleged danger . . . is, in large measure, one of self-censorship; a harm that can be realized even without an actual [enforcement]."  *Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 393 (1988).  While Plaintiff is correct that the injury requirement for Article III standing is "most loosely" applied in the First Amendment context, the injury still "must be imminent" when prospective relief is sought.  *Dermer v. Miami-Dade Cnty.*, 599 F.3d 1217, 1220 (11th Cir. 2010) (internal quotation marks omitted).

---

[5] In his renewed motion to dismiss, Defendant omitted an argument, made in an earlier round of briefing, that Plaintiff cannot rely on an alleged First Amendment injury to establish standing in a § 5 coverage suit that does not contain an independent First Amendment claim.  (Doc. # 16, at 12 n.10.)  We decline here to address the argument, not only because it has been abandoned, but also because its resolution is unnecessary to our decision.  *But see In re Special Grand Jury*, *89-2*, 450 F.3d 1159, 1173 (10th Cir. 2006) (holding that "an infringement on [plaintiffs'] interest in speaking c[ould] constitute the requisite injury in fact for Article III standing even though the [plaintiffs] [were] raising no First Amendment claim").

In the Eleventh Circuit, "for a plaintiff alleging that his speech was chilled to have standing, he or she must show 'that either (1) he was threatened with prosecution; (2) prosecution is likely; or (3) there is a credible threat of prosecution.'" *Pittman*, 267 F.3d at 1283-84 (quoting *ACLU v. Fla. Bar*, 999 F.2d 1486, 1492 (11th Cir. 1995)).  "This requirement comes from the Supreme Court's recognition that '[a]llegations of a subjective chill are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm.'"  *Id.* (quoting *Laird v. Tatum*, 408 U.S. 1, 13-14 (1972)).  Therefore, "'if no credible threat of prosecution looms, the chill is insufficient to sustain the burden that Article III imposes[,]'" and a litigant's "'subjective fear . . . will not be held to constitute an injury for standing purposes unless that fear is objectively reasonable.'"  *Id.* (quoting *Wilson v. State Bar of Ga.*, 132 F.3d 1422, 1428 (11th Cir. 1998)).

Plaintiff does not allege or argue that he has been subjected to a threat that the Alabama Act will be enforced against him.  Rather, he argues that "[a] credible threat exists that the law could be enforced to [his] detriment."  (Pl.'s Resp. 11.)  That is so, he says, because on two prior occasions, former Alabama Attorneys General have stated in written correspondence to the DOJ that "'[t]he State of Alabama will enforce Act No. 95-648'" without obtaining preclearance.  (Pl.'s Resp. 10.)  He, thus, relies on former attorney generals' general threats of enforcement by the state of Alabama.

Plaintiff also emphasizes that "[a]t no time has the [Alabama Attorney General] stated to the [DOJ] that the Act will not be enforced."  (Pl.'s Resp. 10.)

There are no bright line rules for determining whether a threat of enforcement is credible.  As explained by the District of Columbia Circuit, "the adjective 'credible' says little or nothing about the requisite level of probability of enforcement, and clarity prevails only at the poles." *Seegars v. Gonzales*, 396 F.3d 1248, 1252 (D.C. Cir. 2005).  At one pole, "actual threats of [enforcement] made against a specific plaintiff are generally enough to support standing as long as circumstances haven't dramatically changed." *Id.* (citing *Steffel v. Thompson*, 415 U.S. 452, 459 (1974)).  At the other pole, where we ultimately determine this case lies, threats that are "imagined or wholly speculative" do not confer standing; for example, "[e]vidence that the challenged law is rarely if ever enforced . . . may be enough to defeat an assertion that a credible threat exists." *Id.*  The Supreme Court's decision in *Poe* illustrates the latter principle.[6]  *See* 367 U.S. at 497.

_____

[6] The appeal in *Poe* has been described as a case about ripeness (or rather the lack thereof).  *See Assoc. of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 159, 172 n.3 (1970) (citing the *Poe* decision as one based upon ripeness); *see also* Erwin Chemerinsky, *Federal Jurisdiction* § 2.4, at 125 (5th ed. 2007) ("*Poe v. Ullman* is a classic example of a case dismissed for lack of ripeness.").  Given the blur between the doctrinal lines of ripeness and standing in pre-enforcement cases, which often arises in First Amendment challenges, *Poe* has been cited as relevant to the discussion in First Amendment standing cases of whether there exists a credible threat of prosecution sufficient to support a claim of objectively reasonable chill.  *See, e.g.*, *281 Care Comm. v. Arneson*, 638 F.3d 621, 628 (8th Cir. 2011); *Lopez v. Candaele*, 630 F.3d 775, 786 (9th Cir. 2010), *cert. denied*, 2011 WL 916688 (May 16, 2011); *Mangual v. Rotger-Sabat*, 317 F.3d 45, 58 (1st Cir. 2003).  *Poe*  is relied upon here as well.

In *Poe*, the plaintiffs, who brought suit to challenge the constitutionality of Connecticut's then-eighty-year-old, criminal anti-contraceptive statutes, could not demonstrate a justiciable controversy because a "real threat of enforcement [was] wanting." *Id.* at 507.  Notwithstanding the virtual dormancy of the statutes (only one failed prosecution had been initiated), the plaintiffs argued that there was a live controversy because the state's attorney had rendered an opinion that medical advice about contraceptives and their use were forbidden by the statutes and had expressed an intent to uphold Connecticut's laws. *Id.* at 499, 501.  The Supreme Court held that, even if the statements of the state's attorney "convey[ed] a clear threat of imminent prosecutions," they were insufficient to establish the required immediacy for justiciability because the threats lacked plausibility. *Id.* at 501.  The total lack of the statutes' enforcement reflected an "undeviating policy of nullification by Connecticut of its anti-contraceptive laws," and that nullification signaled "more than prosecutorial paralysis." *Id.* at 502.  Moreover, the Court held that the alleged "fear of enforcement of provisions that have during so many years gone uniformly and without exception unenforced" was not a realistic fear. *Id.* at 507.  The statutes amounted to nothing more than "harmless, empty shadows," and "to pass on these statutes now, in order to protect [the plaintiffs] from the hazards of prosecution, would be to close our eyes to reality." *Id.* at 508.

30

As in *Poe*, Plaintiff faces an impassable roadblock on the road to standing.  The statements of the former Alabama Attorneys General that "[t]he State of Alabama will enforce Act No. 95-648" are stale.  The "written threat[s]," as Plaintiff describes them, were made by former office holders in July 1996 and July 1997, at least fourteen years ago.  (Pl.'s Resp. 10.)  Even assuming that the statements, when written, conveyed "a clear threat" of imminent enforcement of the Alabama Act (Pl.'s Resp. 11), the passage of time between the "threats" and the present has neutralized the imminency.  Not once have the so-called threats been carried out.  There is no allegation or argument that any Alabama justice or judge has ever been required to recuse himself or herself based upon application of the Alabama Act.  Indeed, counsel for Plaintiff conceded at the February 24, 2011 status conference that the Alabama Act "has not yet been enforced in any case."  (Tr. of Status Conference 9.)  The former Alabama Attorneys General's stale threats are powerless to demonstrate a credible threat of enforcement of the Alabama Act.  On the facts alleged, Plaintiff faces no credible threat of enforcement, and the prospect of enforcement is wholly speculative.[7]

---

[7] This opinion should not be read as holding that the Alabama Act has been nullified. Until one of these two Alabama political institutions changes its policy, it is at the least a game of political chicken, with both players staring (or perhaps winking) at each other.

Defendant also adds that it is not likely that the Alabama Act will ever be enforced, and certainly not any time in the near future, given that there is no hint that the stalemate between the Alabama Attorney General and the Alabama Supreme Court will give way to a truce.  The Alabama Attorney General refuses to submit the Alabama Act for preclearance, unless there are rules, and the Alabama Supreme Court refuses to adopt the rules, unless the Alabama Act is precleared.

Plaintiff argues that, notwithstanding this stalemate, the threat of enforcement is still realistic.  His first contention is that the failure of the Alabama Supreme Court to provide rules governing the contents and filing of certificates of disclosure under subsection (b) is not a barrier to the enforcement of the recusal requirements because subsection (c) is self-executing and, thus "presently enforceable." (Pl.'s Resp. 11; Tr. of Status Conference 7-9.)  Plaintiff argues that the promulgation of the rules is not a "condition[ ] precedent" to a justice's or judge's recusal under subsection (c).  (Pl. Resp. 12.)  As support for his argument, Plaintiff focuses on the last sentence of subsection (c), which provides that "[u]nder no circumstances shall a justice or judge . . . participate in the action in any way when the justice or judge knows that the contributions of a party or its attorney exceed the applicable limit and there has been no waiver of recusal." § 12-24-2(c).  He further argues that the purpose of subsection (c), *i.e.*, to avoid appearances of impropriety, is fulfilled only by requiring recusal

whenever it is known (whether through a certificate of disclosure or other means) that a party or an attorney contributed above specified levels to the sitting justice's or judge's campaign.  (Pl.'s Resp. 11-13.)

Even if we were tempted by Plaintiff's argument to address this issue of first impression regarding the proper construction of the challenged Alabama Act (which we are not), we fail to see how Plaintiff's proposed construction of the Alabama Act establishes imminence of enforcement.  First, subsection (c) repeatedly requires certificates of disclosure to trigger recusal.  There is no other means provided. Unfortunately for Plaintiff's argument, certificates of disclosure are provided for in subsection (b), which is decidedly not self-executing, but rather is dormant.  Second, assuming *arguendo* that subsection (c) is self-executing, the fact would remain that more than fifteen years have passed since the Alabama Act's effective date on January 1, 1996, and not once during the last decade-and-a-half has the Alabama Act been enforced.  Plaintiff cites no authority suggesting that a self-executing law automatically means that the law presents a credible threat of enforcement, regardless of other circumstances, and we are aware of no such authority.

Plaintiff nonetheless persists that, even if the rules are a condition precedent to the Alabama Act's enforceability, the "Alabama Supreme Court could make the law enforceable with a simple change of the Chief Justice's mind," and, thus, there

is a credible threat of enforcement. (Pl.'s Resp. 14.) But, he posits only a hypothetical, with no allegation or evidence that since the Alabama Act's enactment more than fifteen years ago, any Alabama Supreme Court justice has so changed his or her mind or even indicated a contemplation of a change of mind.[8] And it would take more than a changed mind; it would take the adoption, or at least promulgation, of rules required by the Alabama Act.

*Chamber of Commerce v. FEC*, 69 F.3d 600 (D.C. Cir. 1995), relied upon by Plaintiff, does not compel a different conclusion. In that case, the D.C. Circuit found Article III standing even though the plaintiffs were "not faced with any present danger of an enforcement proceeding" because nothing prevented the Federal Election Commission from "enforcing its rule at any time with, perhaps, another change of mind of one of its commissioners." *Id.* at 603. *Chamber* is distinguishable, not only because the regulation at play was "unusual in that it permit[ted] a private party to challenge the FEC's decision not to enforce" the rule, *id.*, but also because

_____

[8] Plaintiff's reliance on a newspaper account that an unnamed justice on the Alabama Supreme Court has drafted proposed rules lends no support to his argument. (Pl.'s Resp. 14.) Newspaper articles generally are considered hearsay under Rule 801(c) of the Federal Rules of Evidence when offered for the truth of the matter asserted. *See United States v. Baker*, 432 F.3d 1189, 1211 (11th Cir. 2005) ("The Miami Herald articles are . . . inadmissible hearsay, as they are relevant primarily to establish the truth of their contents – the identity of the gunmen."). Indeed, statements in newspapers often present hearsay within hearsay problems. *Id.* at 1211 n.23 ("[T]he articles are likely a reporter's account of what eyewitnesses reported; in other words, double hearsay forbidden by Rule 805."). Because the article consists of hearsay and double hearsay, it is of no value either as an allegation or as a purported evidentiary submission.

the rule was recently promulgated.  Recency is an important factor in the injury-in-fact analysis.  As recognized by the First Circuit, *Chamber* "make[s] clear that when dealing with pre-enforcement challenges to *recently enacted (or, at least, non-moribund)* statutes that facially restrict expressive activity by the class to which the plaintiff belongs, courts will assume a credible threat of prosecution in the absence of compelling contrary evidence."  *N.H. to Life Political Action Comm. v. Gardner*, 99 F.3d 8, 15 (1st Cir. 1996) (emphasis added).  Here, the Alabama Act was not recently enacted, and it is moribund.  There is simply "no factual assurance that future injury is likely."[9]  *Elend*, 471 F.3d at 1212.

Accordingly, Plaintiff has no Article III standing to sue because he has suffered no injury in fact.  The asserted injury is neither concrete, actual nor imminent.  It simply is too conjectural and hypothetical to create Article III standing.

---

[9] For the same reasons, we also are unpersuaded by Plaintiff's argument that absent the incumbent Alabama Attorney General's repudiation of his predecessors' written declarations, the threat of enforcement remains sufficiently credible so as to confer standing.  (Pl.'s Resp. 10.)  Plaintiff relies upon *Virginia v. American Booksellers Association*, 484 U.S. 383 (1988), where the Supreme Court held that the plaintiffs had standing to bring a pre-enforcement First Amendment challenge to a state criminal law, even though no criminal charges were pending against them.  *Id.* at 387, 393.  As support for its conclusion, the Court observed that "[t]he State has not suggested that the *newly enacted* law will not be enforced," and, therefore, it "s[aw] no reason to assume otherwise."  *Id.* (emphasis added).  Here, again, the Alabama Act is not newly enacted, and the long history of non-enforcement, with no inkling that history is soon to change course, gives sufficient reason to assume that the *status quo* is here to stay.

## 2.   *Redressability and Causation*

Defendant also argues that Plaintiff cannot satisfy the second and third elements of standing.  He says that, even if Plaintiff suffered an injury in fact, there is no causal connection between the injury and any conduct by him because he is not the official charged with enforcing the Alabama Act.  (Def.'s Renewed Mot. 4-5 (Doc. # 39); *see also* Def.'s Reply 6-7.)  Rather, Defendant argues that the Alabama Act's "provisions are enforced exclusively by the Judicial Branch." (Def.'s Renewed Mot. 5; *see also* Def.'s Reply 2 (arguing that a petition for a writ of mandamus in the Alabama Supreme Court is the appropriate remedy for a judge's refusal to recuse).) Because he does not enforce the Alabama Act, Defendant also contends that Plaintiff cannot show that any injury could be redressed if Plaintiff prevailed.  For example, Defendant argues that "[a]n injunction that prohibits the [Alabama] Attorney General from enforcing a statute he does not enforce would accomplish nothing." (Def.'s Renewed Mot. 7.)  Plaintiff strenuously opposes these arguments.

We note these arguments, but we need not decide the questions of redressability and causation because, as discussed above, Plaintiff clearly lacks Article III standing for failure to demonstrate an injury in fact. *Cf. Fla. Family Policy Council v. Freeman*, 561 F.3d 1246, 1255 (11th Cir. 2009) (declining to decide all the

elements of standing because the plaintiff clearly "los[t] the standing war on the redressability battle").

**B.    <u>Ripeness</u>**

Plaintiff's threshold argument is that, because the Supreme Court in *Allen* "did not add a 'ripeness' element to the private cause of action lawsuits under § 5," he is not required to demonstrate ripeness.  (Pl.'s Resp. 19 (citing *Allen*, 393 U.S. at 544).) Plaintiff would have us construe § 5 as imposing no ripeness requirement, but that argument is untenable.  There was no such holding in *Allen*, nor was a holding on ripeness necessary to the result of the decision in that case.  *See United States v. Lee*, 603 F.3d 904, 916 (11th Cir. 2010) ("[T]he holding of a case is . . . comprised both of the result of the case and those portions of the opinion necessary to that result by which we are bound." (citations and internal quotation marks omitted)).  The Supreme Court, however, addressed ripeness in the context of § 5 in *Texas v. United States*, 523 U.S. 296 (1998), holding that because the purported harm was "contingent on a number of factors," the claim was "too speculative" and "not fit for adjudication." *Id.* at 300-01.  The argument that ripeness, in effect, is irrelevant in § 5 cases is belied by *Texas* and also is at odds with the established principle that ripeness raises a "basic question of jurisdiction that cannot be waived and goes to the very heart of the 'case or controversy' requirement of Article III."  *Fla. Ass'n of Rehab. Facilities, Inc.*, 225

F.3d at 1227 n.14.  Plaintiff seeks to avoid constitutional justiciability requirements, but that simply will not do.  In short, Plaintiff must demonstrate that his § 5 suit is ripe.

The "ripeness doctrine is drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction."  *Reno v. Catholic Soc. Servs., Inc.*, 509 U.S. 43, 57 n.18 (1993) (citing *Buckley v. Valeo*, 424 U.S. 1, 114 (1976) (per curiam)).  However, "[e]ven when a ripeness question in a particular case is prudential, [a court] may raise it on [its] own motion, and 'cannot be bound by the wishes of the parties.'"  *Id.* (citing *Reg'l Rail Reorganization Act Cases*, 419 U.S. 102, 138 (1974)).  "Ripeness is peculiarly a question of timing.  Its basic rationale is to prevent the courts, through premature adjudication, from entangling themselves in abstract disagreements."  *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 580 (1985) (citations and alterations omitted).  A claim is not ripe for adjudication if it rests upon "'contingent future events that may not occur as anticipated, or indeed may not occur at all.'"  *Id.* at 580-81; *see also In re Jacks*, No. 09–16146, 2011 WL 2183979, at *7 (11th Cir. 2011) (published) ("A claim is not ripe when it is based on speculative possibilities.").  Moreover, "when a plaintiff lacks standing for prospective relief because the injury in fact requirement [of Article III standing] is not satisfied, then the claim is usually 'not ripe because the factual

predicate for the injury has not fully materialized.'" *Dermer*, 599 F.3d at 1221 (quoting *Elend*, 471 F.3d at 1205). Two factors are pertinent to the analysis of ripeness: "(1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration." *Nat'l Adver. Co. v. City of Miami*, 402 F.3d 1335, 1339 (11th Cir. 2005). We address these factors in reverse order.

Defendant argues that the case is not ripe because there is no "realistic threat of enforcement" of the Alabama Act. (Def.'s Renewed Mot. 7-10.) "Hardship can sometimes be established if a plaintiff demonstrates that he would have to choose between violating an allegedly unconstitutional statute or regulation and risking criminal or severe civil sanctions." *Elend*, 471 F.3d at 1211. A plaintiff, however, "must still demonstrate a credible threat of prosecution." *Id.* (internal quotation marks and citations omitted). "This requirement is not satisfied if 'it would strain credulity to say that there is a credible threat that [a plaintiff's] First Amendment rights will be violated in the future.'" *Dermer*, 599 F.3d at 1221 (quoting *Elend*, 471 F.3d at 1211).

Plaintiff's arguments that he suffers "substantial hardship in the form of self-censorship and being forced to accept an unprecleared change to" a voting practice are the same ones he made in support of his contention that he suffered an injury in fact for purposes of Article III standing. (Pl.'s Resp. 19-20.) We rejected those

39

arguments, and, in particular found neither an injury that is concrete or actual nor a credible threat of enforcement of the Alabama Act, but instead found only that any future injury is purely conjectural and hypothetical.  For the same reasons discussed in Part V.A.1 of this opinion, we find Plaintiff's arguments insufficient to demonstrate that deferring judicial review will cause any real hardship to Plaintiff.

Turning to the fitness inquiry, Plaintiff is correct that the issue of whether the Alabama Act requires preclearance under § 5 presents a legal question. *See Pittman*, 267 F.3d at 1278 ("[C]laims are less likely to be considered 'fit' for adjudication when they venture beyond purely legal issues."); (*see* Pl.'s Resp. 20.)  Nonetheless, an action "is not fit for adjudication" when the record provides "no factual assurance that future injury is likely." *Elend*, 471 F.3d at 1211-12.  We cannot say that, on this record, future injury is likely where Plaintiff has not made a campaign contribution to an Alabama state justice or judge that exceeds the Alabama Act's specified monetary thresholds, where Plaintiff is not involved in pending litigation in an Alabama state court, and where the Alabama Act has never been enforced so as to require a sitting justice or judge to recuse.   The issues are not fit for adjudication.

Because this action is not fit for judicial decision at this time and there is no hardship to Plaintiff in withholding consideration of his claims, they are not ripe for adjudication.  Accordingly, the claims also are due to be dismissed as not ripe.

## VI.  CONCLUSION

We conclude that Plaintiff has not shown an injury in fact necessary to achieve Article III standing in this § 5 suit brought to obtain injunctive relief against enforcement of the Alabama Act No. 95-648 pending preclearance, and to obtain a declaratory judgment that the Alabama Act requires preclearance.  The Alabama Act has lain dormant since its enactment more than fifteen years ago, and Plaintiff fails to demonstrate any concrete or actual injury or credible threat of enforcement.  On this record, Plaintiff's fear of enforcement is wholly speculative.  For substantially the same reason, Plaintiff's § 5 lawsuit is not ripe.  Accordingly, Defendant's renewed motion to dismiss is due to be granted, and this action dismissed for lack of subject matter jurisdiction, pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure.

An appropriate order and final judgment will be entered separately.

DONE this 21st day of June, 2011.

/s/ Gerald Bard Tjoflat
UNITED STATES CIRCUIT JUDGE

/s/ W. Keith Watkins
CHIEF UNITED STATES DISTRICT JUDGE

/s/ Mark E. Fuller
UNITED STATES DISTRICT JUDGE

41